Eppley Hotels Company, a Corporation v. Commissioner.
Eppley Hotels Co. v. Commissioner
Docket Nos. 103674, 112448.
United States Tax Court
1945 Tax Ct. Memo LEXIS 259; 4 T.C.M. (CCH) 335; T.C.M. (RIA) 45105; March 24, 1945
William J. Hotz, Esq., and E. C. Loucks, C.P.A., 837 Omaha Nat. Bank Bldg., Omaha, Neb., for the petitioner. Owen W. Swecker, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined the following deficiencies in income tax: 1937
$2,833.30
1938
1,416.08
Fiscal period Jan. 1 to June 30, 1939
2,136.41
Fiscal year July 1, 1939 to June 30, 1940
9,302.20
Petitioner claims overpayments for the year 1937 in the amount of $3,349.94 and for the year 1938 in the amount of $2,803.20. The issue is - Did respondent err in determining that petitioner realized taxable income on the purchase of its own bonds at a price less than the issuing price or face value of such bonds? Findings of Fact Petitioner is a Delaware corporation, incorporated *260 in March of 1926 to own, lease, and operate hotels. Its business headquarters and principal offices are in Omaha, Nebraska, and its returns for the taxable periods were filed with the collector of internal revenue for the district of Nebraska. Eugene C. Eppley is the owner of all of its capital stock and at all times has been its president and general manager. On July 1, 1926, petitioner owned real estate and the following fully equipped hotels situated thereon: Hotel Lincoln at Lincoln, Nebraska
Capital Hotel at Lincoln, Nebraska
Evans Hotel at Columbus, Nebraska
Lincoln Hotel at Scottsbluff, Nebraska
Norfolk Hotel at Norfolk, Nebraska
Chieftain Hotel at Council Bluffs, Iowa
Cataract Hotel at Sioux Falls, South Dakota
At the same time it owned all the capital stock of the following corporations, which leased real estate and hotel buildings situated thereon from others but which owned the hotel furniture and fixtures: Rome Hotel Company, Omaha, Nebraska (Rome Hotel) Sioux Falls Hotel Company, Sioux Falls, S.D. (Carpenter) Lindell Hotel Company, Lincoln, Neb. (Lindell Hotel) M & M Hotel Company, Cedar Rapids, Iowa (Montrose) Martin Hotel Company, Sioux City, *261 Iowa (Martin Hotel) West Hotel Company, Sioux City, Iowa (West Hotel) Magnus Hotel Company, Cedar Rapids, Iowa (Magnus Hotel) Interstate Hotel Company, Omaha, Neb. (Fontenelle Hotel) On July 1, 1926, petitioner executed a First Mortgage Trust Indenture upon the capital stock of the subsidiaries and the hotel properties owned by it to secure a loan of $2,500,000, evidenced by first mortgage bonds, par value $100 each, bearing 6 1/2 percent interest, payable to bearer, maturity date July 1, 1941. The Omaha Trust Company of Omaha was named trustee. The bonds were sold to the general public. The bonds were to be retired from a Sinking Fund as follows: May 10, 1927, $50,000; November 27, 1927, $25,000; May 10, 1928, $25,000; November 10, 1928, $37,500; $37,500 on the 10th of May and November of each year, including 1931; thereafter $62,500 on the 10th of May and November of each year to May 10, 1936; and thereafter $75,000 on the 10th of May and November of each year until July 1, 1941, when the remainder became due. The interest coupons were payable semi-annually. The sinking fund was to be established by petitioner depositing with the trustee "cash and/or bonds then outstanding *262 taken at the principal amount." The cash so deposited, in excess of the amount required for interest, was to be applied in the retirement of bonds, purchased by the trustee or called by lot. The amount received from the sale of the bonds was expended for the following purposes: Cost of financing bond issue
$ 283,000.00
Notes payable at banks retired
470,000.00
Bonds on Evans Hotel retired
80,000.00
Completion of construction of Nor-
folk Hotel
352,733.00
Rehabilitation of Lincoln Hotel
410,000.00
Completion and furnishing of Chief-
tain Hotel
450,000.00
Completion and furnishing of Capi-
tal Hotel
400,000.00
Bonds on Lincoln Hotel, Scottsbluff,
Neb., retired
54,000.00
$2,499,733.00
Interest at the rate of 6 1/2 percent was paid on all bonds from July 1, 1926, up to and including the installment due January 1, 1932. Interest at the rate of 3 1/2 percent was paid on bonds deposited under a Bondholders Protective Agreement for 1932 in lieu of payment of the coupons due July 1, 1932, and January 1, 1933. As of June 18, 1932, petitioner had retired $450,000 principal amount of said bonds, leaving $2,050,000 outstanding. On June 18, 1932, a Voting *263 Trust Agreement was entered into between petitioner, its stockholders and three Voting Trustees pursuant to the terms of a Bondholders Protective Agreement dated June 17, 1932. This agreement required the deposit of shares of petitioner's preferred and common stock sufficient for control of the company. Upon receipt of the stock the Voting Trustees issued voting trust certificates representing the number of shares of stock which had been turned over to them. The Voting Trust was to continue until a sufficient number of the outstanding bonds had been redeemed to reduce the amount outstanding to $1,300,000. In any event, however, it was to terminate July 1, 1937. Upon termination the stock was to be returned to its owner. Eppley, president of petitioner and sole owner of its capital stock, was one of the three voting trustees. In addition to the properties and stock owned by petitioner as of July 1, 1926, which were subject to the mortgage indenture, four additional properties, which had been acquired by petitioner after July 1, 1926, were brought under the provisions of the "Voting Trust Agreement." These properties were either owned or leased by the following subsidiary companies, *264 whose capital stock was owned by petitioner: "Blackstone Hotel Company, owner of the furniture and fixtures but lessee of real estate and building known as the Warrior Hotel and located at Sioux City, Iowa. "Tallcorn Hotel Company, owner of real estate, building and equipment known as the Tallcorn Hotel and located at Marshalltown, Iowa. The property was subject to mortgages aggregating $209,666.75. "Logan Hotel Company, owner of real estate, building and equipment known as the Logan Hotel and located at Omaha, Nebraska. The property was subject to mortgages aggregating $260,357.31. "Seelbach Hotel Company, owner of real estate, building and equipment known as Seelbach Hotel and located at Louisville, Kentucky. The property was subject to mortgage indebtedness aggregating $1,995,000." While a substantial majority of the bondholders had acquiesced in the selection of a bondholders protective committee and were agreeable to trying to work out petitioner's financial problems through the voting trust, some of the minority bondholders were dissatisfied. They attempted to force foreclosure of the mortgage and instituted a suit asking for the appointment of a receiver. Although *265 this was abortive, petitioner, apparently with the consent of the trustees representing the majority of the bondholders, on June 30, 1934 filed in the United States District Court at Omaha, Nebraska, its application to reorganize, in part, its financial structure and obligations, under Section 77-B, Amendment to the United States Bankruptcy Act (Public No. 294). At the time of its filing its petition with the District Court, petitioner had retired $700,000 of its bonds, leaving $1,800,000 outstanding as of June 1934. On August 28, 1934, the cause was referred to a Special Master. In due time he filed a report recommending approval of the Plan of Reorganization, which had been filed. His report stated, inter alia: "* * * The proof is that inability of the Debtor to meet its obligations has been due entirely to the severity of the business depression. The proof is further convincing, if not conclusive, that unless some plan of reorganization is effected it is certain that the Debtor will have to be liquidated by foreclosure or other proceedings including possibly bankruptcy, in which event the bondholders will be fortunate if they receive as much as 10" or 15" on the dollar of the *266 face of their bonds. * * * "* * * From an earning standpoint neither the common nor preferred stock has at this date any value. It is equally as certain that if liquidation is forced neither the common nor preferred stock has any value. * * * The refusal to approve the plan as amended is certain to result in great loss to accepting and objecting bondholders and the holder of the stock. Its acceptance offers a fair possibility of benefiting both the accepting and objecting bondholders." On December 8, 1934, the United States District Judge for the District of Nebraska entered an "Order Confirming Plan of Reorganization." The order approved and confirmed the report of the Special Master on the Plan of Reorganization proposed by the debtor and adopted the recommendations contained therein. On January 26, 1935, the final order of the court was entered, the court reserving jurisdiction for the sole purpose of approving compensation for services rendered by the attorney. The petition filed by the debtor in the reorganization proceedings had alleged: "That altho the assets of the Debtor at their present fair market value, exceed the liabilities of the Debtor, both accrued and deferred, *267 the Debtor is nevertheless unable to meet its debts as they mature and desires to effect a plan of reorganization pursuant to the aforementioned Act of Congress." Unpaid taxes at the time the petition under 77 B was filed amounted to more than $100,000. The Plan of Reorganization provided that the "Old Bonds" then outstanding in the amount of $1,800,000 should be retired and cancelled and "New Bonds" in the amount of $1,800,000 should be issued. The new bonds were to bear interest at the rate of 3 percent from July 1, 1935, to July 1, 1940, and at the rate of 5 percent from July 1, 1940, to maturity. The maturity date was fixed as July 1, 1951. Scrip certificates were to be issued in exchange for the outstanding interest coupons on the old bonds due July 1, 1932 and January 1, 1933, upon which bonds no interest had been paid for the year 1932. (Failure to pay interest on these bonds was due to the fact that they had not been deposited under the Bondholders Protective Agreement.) This unpaid interest, at the rate of 3 percent, amounted to $11,836.50. The Reorganization Plan further provided that the company should establish a sinking fund and deposit with the Trustee to the credit *268 of the sinking fund, "cash and/or new bonds" to be retired substantially as heretofore outlined in connection with the old bonds. $33,000 principal amount of the new bonds were to be retired each six months beginning January 1, 1936, through 1938; $39,000 January 1, 1939; $39,500 July 1, 1939; $39,000 January 1, 1940; $39,500 July 1, 1940, with increasing amounts up to January 1, 1951, when the balance became payable. In addition to the sinking fund, the Plan provided that the company should set aside in a supplemental sinking fund 25 percent of the net income or earnings of the company, for the purpose of purchasing bonds on the market and retiring them, if bonds could be purchased at par or less, or in lieu thereof that the company should deposit the funds with the Trustee to be held by it until bonds "may be purchased at par or called by lot as provided in the trust indenture." The term "net income" was defined to mean all income or earnings remaining on hand after deducting all operating expenses and fixed charges, all taxes paid and reserves for taxes due and not yet paid, insurance, interest and sinking fund payments to accrue under the plan during all prior years and the then *269 calendar year, and reasonable expenditures for repairs, maintenance, and depreciation or obsolescence, not exceeding, however, the amount allowed by the United States Government for income tax purposes. The Reorganization Plan provided that a supplemental mortgage should be executed which would continue the lien of the mortgage of July 1, 1926, to secure the new bonds. It expressly stated that obligations of the company other than its obligations to the bondholders were not affected and that the company was authorized to pay all of its debts and obligations in the same manner as though the proceedings had never been instituted or carried out. Petitioner complied with the terms of the Reorganization Plan and the supplemental mortgage indenture by depositing bonds according to the dates and schedules set out in the indenture. It likewise has satisfied the interest requirements thereunder. The Voting Trust Agreement above referred to, dated June 18, 1932, was to remain in full force and effect until terminated in accordance with its provisions; and, until so terminated, neither the Eppley Hotels Company nor any of its subsidiaries was to acquire any new hotel properties or incur *270 any obligations for, or make any capital expenditures in any amount exceeding, $7,500 without the prior approval of the voting trustees. On September 2, 1936, the parties to the Voting Trust Agreement entered into an agreement that it should continue until July 1, 1940; provided, however, that if no default existed in any of the terms or conditions of the mortgage or supplemental mortgage of the company on July 1, 1937, then the voting trust would expire on that date in accordance with its original terms. Thereafter the voting trustees filed an application seeking an order of the United States District Court for the District of Nebraska, terminating the trusteeship on the ground that there had been no default in any of the terms or conditions of the mortgage or supplemental mortgage, and that under the terms of the private agreement of September 2, 1936, the provisions continuing the voting trust agreement did not apply. The Court denied the application on the ground that it had no jurisdiction to enter any valid order affecting any agreements entered into subsequent to the final order of January 26, 1935. It stated that the amendment to the voting trust agreement was executed long *271 after the reorganization proceedings were finally terminated; that the agreement was a private one, made without, and not in pursuance of, an order of the Court; and that by the final decree entered in the reorganization proceedings the debtor had been restored to the full possession and control of the property, subject only to the voting trust then existing (which provided for automatic termination on July 1, 1937). The application was, therefore, denied. The trustees remained in possession of the debtor's property under the terms of the Voting Trust Agreement until July 1, 1940. The summer of 1934 was unusually dry and hot in the territory in which petitioner's hotels are located. The succeeding years - 1935 and 1936 - were worse, approaching a general drought in the whole area. "Dust bowls" were created, crops were poor or non-existent, travel decreased substantially, transient guests at the hotels became very scarce, and petitioner was obliged to resort to the expediency of filling its rooms with "regulars" - i.e. local residents who were willing to pay only a small per centum of the rent which would normally be paid by "transients". Most of the hotels were operated at a loss *272 and two of them were entirely abandoned. By January 1, 1937, petitioner had depleted its capital to the extent of $731,417.67 and by June 30, 1939, to $1,015,213.38. Some improvement occurred in the fiscal year ending June 30, 1940. The net income or loss of petitioner (including hotel properties owned by it), and of its various subsidiaries, as adjusted by the Commissioner, is shown in the following table: First Six
Year Ended
1937
1938
Months - 1939
June 30, 1940
EPPLEY HOTELS CO.
Taxable income less bond discount
($ 227.94)
($36,150.42)
($30,723.67)
($ 7,381.46)
Net income after tax
( 227.94)
( 36,150.42)
( 30,723.67)
( 7,381.46)
LOGAN
Taxable income
( 9,291.57)
( 12,532.99)
( 4,008.17)
( 1,622.91)
Net income after tax
( 9,291.57)
( 12,532.99)
( 4,008.17)
( 1,622.91)
TALLCORN
Taxable income
( 4,249.28)
1,101.99
1,113.09
3,700.26
Federal income tax
137.75
139.14
462.53
Net income after tax
( 4,249.28)
964.24
973.95
3,237.73
SEELBACH
Taxable income
( 3,717.89)
( 57,347.56)
( 35,895.69)
( 24,111.58)
Net income after tax
( 3,717.89)
( 57,347.56)
( 35,895.69)
( 24,111.58)
FONTANELLE
Taxable income
$23,197.56
$35,083.98
$37,336.78
$26,554.75
Federal income tax
6,277.59
6,665.96
7,093.99
4,022.52
Net income after tax
16,919.97
28,418.02
30,242.79
22,532.23
MONTROSE
Taxable income
( 14,618.98)
( 3,217.87)
( 7,043.85)
2,337.39
Federal income tax
292.17
Net income after tax
( 14,618.98)
( 3,217.87)
( 7,043.85)
2,045.22
MAGNUS
Taxable income
( 3,505.74)
( 2,390.67)
( 1,521.32)
1,369.00
Federal income tax
171.13
Net income after tax
( 3,505.74)
( 2,390.67)
( 1,521.32)
1,197.87
CARPENTER
Taxable income
18,934.33
24,970.70
11,612.47
19,655.02
Federal income tax
4,888.86
3,520.31
1,550.75
2,676.70
Net income after tax
14,045.47
21,450.39
10,061.72
16,978.32
ROME
Taxable income
2,254.22
( 14,474.00)
( 3,505.69)
4,806.75
Federal income tax
332.60
600.84
Net income after tax
1,921.62
( 14,474.00)
( 3,505.69)
4,205.91
MARTIN
Taxable income
9,405.83
24,077.08
19,293.25
14,105.06
Federal income tax
1,910.87
3,377.33
2,626.06
1,899.71
Net income after tax
7,494.96
20,699.75
16,667.19
12,205.35
CATARACT (Owned but placed under
leasehold)
Taxable income
7,714.04
6,359.62
( 1,073.84)
9,392.84
Federal income tax
1,431.25
815.35
1,240.00
Net income after tax
6,282.79
5,544.27
( 1,073.84)
8,152.84
WARRIOR
Taxable income
1,568.91
( 8,138.70)
( 317.11)
( 27,368.84)
Federal income tax
226.55
Net income after tax
1,342.36
( 8,138.70)
( 317.11)
( 27,368.84)
*273 Petitioner and its subsidiaries kept their books on an accrual basis. The amounts shown in the foregoing table as net income after taxes exclude depreciation, interest, taxes, rents, etc. In the instances where the rents had been reduced contingent rent was not deducted as an expense. The Lindell Hotel, operated by the Lindell Hotel Company, at Lincoln, Nebraska, and the West Hotel, operated by the West Hotel Company, at Sioux City, Iowa, are not included in the above table inasmuch as these properties had been abandoned by petitioner prior to 1937 after unsuccessful attempts had been made to operate them at a profit. In the following schedule is shown: (1) The mean of the cash, accounts receivable, inventories, deferred charges, cash value of life insurance, and "subscriptions", as shown on petitioner's balance sheets at the beginning and end of each taxable period. (2) The aggregate [maximum] value during the taxable periods of all other property owned by petitioner, including lands, investments in stock of subsidiaries and hotel properties, leases, hotel buildings and equipment. (3) The mean of the notes payable, accounts payable, accrued expenses and other liabilities (except *274 bonds) as shown on the balance sheets at the beginning and end of each taxable period. (This does not include the mortgages on the Tallcorn, Logan and Seelbach hotels.) (4) The mean of the bonds secured by the indenture of July 1, 1926, as modified in the reorganization proceeding in 1934. ASSETS
1-1-39 to
7-1-39 to
1937
1938
6-30-39
6-30-40
(1)
$ 302,869.27
$ 235,138.56
$ 211,856.00
$ 274,485.02
(2)
1,600,000.00
1,500,000.00
1,400,000.00
1,300,000.00
Total Assets
1,902,869.27
1,735,138.56
1,611,856.00
1,574,485.02
LIABILITIES
(3)
$ 423,594.48
$ 345,619.05
$ 254,991.93
$ 290,802.96
(4)
1,675,000.00
1,597,700.00
1,510,500.00
1,435,500.00
$2,098,594.48
1,943,319.05
1,765,491.93
1,726,302.96
Petitioner was insolvent throughout the period January 1, 1937, to June 30, 1940. During the taxable periods petitioner purchased some of its outstanding bonds at substantial discounts. The prices paid ranged from a low of $23 to $30.50 per $100 during 1937 and 1938, the average being $27.38 during those years. The average price paid during the fiscal period ending June 30, 1939 $38was per $100 and $49.55 during the *275 period ending June 30, 1940. The bonds purchased were turned over to the trustee under the mortgage indenture and retired. The difference between the face value of the bonds purchased and the aggregate amount paid for them in each period was as follows: 1937
$49,182.87
1938
63,320.04
Fiscal Period 1/1/39 to 6/30/39
46,519.46
Fiscal Period 7/1/39 to 6/30/40
56,340.42
Petitioner included the first two amounts in its gross income for the years 1937 and 1938. It alleges it erred in doing so. Timely claims for refund of the tax paid have been filed. Petitioner did not include the other amounts in its gross income; but they were included by the Commissioner in determining the deficiencies in tax. Opinion Petitioner makes several contentions in support of its claim that the respondent erred in determining that it received taxable income as a result of the purchase and retirement of its bonds. The contention which, in our opinion, has merit is that the purchase for an amount less than the issuing price or face value of the bonds did not result in the receipt of taxable income because it was insolvent both before and after the purchases were made. A "reduction in *276 outstanding liabilities which does not make a taxpayer solvent does not result in taxable gain." . See also ; ; ; ; and . Cf. . Respondent urges that petitioner did not prove its insolvency during each of the taxable periods. The evidence convinces us to the contrary, however, and we have made a finding that petitioner was insolvent throughout the period January 1, 1937 to June 30, 1940. This finding is based upon a careful consideration of all of the evidence submitted, especially that with reference to the value of lands, hotel buildings, furniture and equipment owned by petitioner, leased properties and its investments in stock of subsidiaries. It would serve no useful purpose to set out all of the evidence, but a brief review of it may not be amiss. Most of petitioner's property *277 had been acquired prior to the business depression of 1929. As a result of the depression petitioner's income decreased. The condition continued until, in 1932, it defaulted in the payment of interest upon its bonds. A bondholders' protective committee, in an effort to assist it and the holders of the bonds, took charge of its business under a trust agreement. Minority bondholders insisted upon more drastic action. In 1934 it invoked the protection of the court under a Section 77 B proceeding. The major relief secured was a reduction in interest and an extension of time within which to retire its bonds. Whether this, in a normal period, would have enabled it to become a successful, prosperous enterprise can only be surmised. Unfortunately the ensuing years brought unforeseen difficulties - a series of hot, dry summers, scorching the earth, drying up the crops and pastures, causing "dust bowls", crop failures, death of livestock, suffering, near famines, and almost a stoppage of travel, in the territory serviced by petitioner's hotels. Petitioner's income fell off substantially. During the period 1934 to 1936, inclusive, many of its hotels were operated at a loss. No appreciable improvement *278 occurred in 1937 although the loss sustained in that year was relatively small. Large losses were sustained in 1938, 1939 and during the first 6 months of 1940, the end of the taxable period now before us. So much, then, for the background against which the opinion evidence is to be examined. Two witnesses testified at length. It is true, as respondent argues, that one of them - Eppley - is vitally interested in the outcome of this litigation and that the testimony of the other was subject to some infirmities. These circumstances have not been overlooked by us in weighing their testimony. The depression beginning in the fall of 1929 and the "dust bowl" conditions existing in the years 1934, 1935 and 1936, however, are too well-known to be the subject of speculation. Probably both are matters of which we may take judicial notice. Both were contributing factors in the falling off of petitioner's income; and the amount of the shrinkage is not in dispute. The values fixed by the witnesses have not been accepted by us. In many instances they are much too low. The value determined by us is practically twice as great as the composite fixed by the witnesses. The essence of their testimony *279 may be gleaned from the following: Values placed on property owned in fee: HOTEL
EPPLEY
STEVENS
Lincoln, Lincoln, Neb.
$27,000
$ 15,000
Capital, Lincoln, Neb.
75,000
120,000
Evans, Columbus, Neb.
No value
30,000
Lincoln, Scottsbluff, Neb.
25,000
Had no knowledge
Norfolk, Norfolk, Neb.
4,000 (1)
90,000
Chieftain, Council Bluffs, Ia.
No opinion of
105,000
value given
Cataract, Sioux Falls, S.D.
75,000
76,000
(1) Eppley did not value the real property.
Values placed on properties leased by subsidiaries: HOTEL
EPPLEY
STEVENS
Fontenelle, Omaha, Neb.
(1)
$125,000 (2)
Rome, Omaha, Neb.
$10,000
4,000
Carpenter, Sioux Falls, S.D.
50,000
Was not asked to
express opinion
Montrose, Cedar Rapids, Iowa
No value
5,000
Martin, Sioux City, Iowa
No value
15,000
Warrior, Sioux City, Iowa
No value
10,000
Magnus, Cedar Rapids, Iowa
No value
1,000
Lindell, Lincoln, Neb.
Abandoned
West, Sioux City, Iowa
Abandoned
(1) Valued stock of operating company as $75,000 to $100,000.
(2) Valued at $75,000 for 1937 and increased to $125,000 for 1939 to 1940.
The values placed upon the Seelbach Hotel at Louisville, *280 Kentucky, the Tallcorn Hotel at Marshalltown, Iowa, and the Logan Hotel at Omaha, all of which were subject to large mortgages, were nil. Each of the witnesses expressed the opinion none was worth a sum equivalent to the mortgage against it. In discussing a situation somewhat analogous this tribunal, in , said: That the property was worth substantially less than the face amount of petitioner's obligations seems to us an inescapable conclusion. On any theory of valuation, whether derived from the opinions of qualified witnesses, * * *, from a capitalization of the prospective and actual earnings of the property, from a general consideration of the condition of the general real estate market, or by reference to the market value of the bonds secured by the property, the result is similar. Neither the excessive valuation for bookkeeping purposes * * * nor the discrepancy between the value we have found and the face amount of the obligations issued requires a disregard of these uncontroverted factors * * *. In fact, the figure we have included in our findings is * * * greater than could be substantiated by the record. It represents a maximum *281 rather than an attempt to fix a value definite for all purposes. But the possibility of error is thus adequately discounted, and, since the figure adopted is yet so low as still to demonstrate petitioner's insolvency, it satisfies us that no contrary conclusion would be tenable. The figures we have found to be the value of petitioner's properties represent maximum values wherein the possibility of error has been adequately discounted. When these values and the values of petitioner's current assets are compared with its liabilities in each of the periods before us, the conclusion that petitioner was insolvent, both before and after it purchased the bonds in question, is inescapable. It follows that the gain resulting therefrom was improperly included in gross income. The conclusion reached renders it unnecessary to discuss or decide other contentions and arguments made by petitioner. Overpayments in tax were made in 1937 and 1938, the amount of which will be determined under Rule 50. The deficiencies in tax for the other two periods will be recomputed and Decision will be entered in each case under Rule 50.